# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| CONNIE FAYE MITSUING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:09CV02124 ERW |
| | ) | |
| JOSEPH LOWRY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on Connie Faye Mitsuing's Complaint for Return of
Child to Petitioner and for Immediate Issuance of Show Cause Order to Respondents [doc. #1],
brought pursuant to Articles 3 and 12 of the Hague Convention on the Civil Aspects of
International Child Abduction, and Section 4 of the International Child Abduction Remedies Act,
42 U.S.C. §§ 11601-11611. Under Federal Rule of Civil Procedure 52(a)(1), the Court enters the
following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

### A. TESTIMONY OF JOSEPH LOWRY, FATHER OF C.L.

Defendant Joseph Lowry ("Father") is 26 years old and is the biological father of C.L. He
met Plaintiff Connie Faye Mitsuing ("Mother") in approximately 2001, at the age of "16 and a
half," when he was in Canada playing hockey. C.L. was born on August 21, 2006, in Meadow
Lake, Saskatchewan. At the time of the child's birth, Father and Mother lived in Loon Lake,
Saskatchewan with her parents and "some of her family." They lived there "off and on" when he
was 16, until he was 22 or 23. He moved back to the United States "during the summers" and

returned to Canada during the winters to play hockey. (Trial Tr. 1-19-10 P.16 L.10-P.19 L.1). Father described Loon Lake as both an Indian reservation and a town. He confirmed that a tribe in that area is referred to as a "Band," and stated that Mother was supposed to register C.L. with the Band, but he didn't know the details. He acknowledged that Mother's father was a Band counselor. (Trial Tr. 1-19-10 P.19 L.25-P.21 L.2).

After C.L. was born, Father lived with Mother in Loon Lake "roughly a month, not even a month," then they "moved down here in May. Around May 20th [2006], approximately." (Trial Tr. 1-19-10 P.19 L.11-17). C.L. was one-month old when Father, Mother and C.L. moved from Loon Lake, Saskatchewan to St. Charles, Missouri. (Trial Tr. 1-19-10 P.21 L.8-15). Father testified that the decision to bring C.L. to the United States one month after the child's birth was a mutual decision between him and Mother. He said that they both agreed that C.L. "would be raised a lot better rather than the community she was from, and we didn't feel that it was safe and that he had an opportunity here to be raised a lot better." (Trial Tr. 1-19-10 P.33 L.21-P.34 L.6). He explained that Loon Lake, Saskatchewan is small and isolated, and has a lot of violence and crime. He said that Mother favored the move "greatly." (Trial Tr. 1-19-10 P.34 L.17-25).

While in St. Charles, Mother and Father lived with Father's parents. Father worked and Mother stayed at home with C.L. (Trial Tr. 1-19-10 P.35 L.1-17). They lived with Father's parents for eleven months, until May 2007, when Father got a job in Union, Missouri. (Trial Tr. 1-19-10 P.21 L.16-P.22 L.4). Father, Mother, and C.L. moved to Union, where they lived in the same residence. (Trial Tr. 1-19-10 P.35 L.18-P.36 L.6). Shortly after moving, Mother returned to Canada with C.L. for what Father described as a "visit." (Trial Tr. 1-19-10 P.24 L.6-P.25 L.9). Father said that he was told by Mother, after they had lived in Union for a couple of days,

that she was "going up there to visit her family[,] [a]nd I had asked, you know, when she was coming back, and she said that her father was going to take her back and it would be a couple of weeks." (Trial Tr. 1-19-10 P.38 L.13-16). Father testified that Mother did not tell him that she was moving back to Canada, and "she left all her stuff." (Trial Tr. 1-19-10 P.39 L.10-15). Father was aware that Mother only had one-way tickets to Canada for herself and C.L. (Trial Tr. 1-19-10 P.40 L.6-8). However, Mother told him that "her father was going to be purchasing [tickets] as soon as she got there, that he didn't have the money to then." (Trial Tr. 1-19-10 P.40 L.16-19).

Approximately three or four weeks after Mother left for Canada, it became "a little more clear" to Father that they were not going to return, and as soon as he "lost contact," it became entirely clear that they were not going to return. (Trial Tr. 1-19-10 P.25 L.10-20). He testified that after June 2007, he tried for a certain amount of time to contact Mother in Canada, but "eventually stopped trying to get a hold of her." (Trial Tr. 1-19-10 P.42 L.13-20). Father admitted that during the one and one-half year period that C.L. was in Canada, he did not seek court intervention, or otherwise attempt to have C.L. returned. (Trial Tr. 1-19-10 P.26 L.12-22). Father testified, in response to a question as to whether he had seen a lawyer, that he was unaware of the Hague Convention until September 2009, and considering "all of the hassle just to get them to be living down here at the time, as far as him being a citizen up there and everything, and we hadn't gotten everything done with down here, it was almost as if I - - you know, I just felt that I had no grounds." (Trial Tr. 1-19-10 P.43 L.6-16). He said that "we did call around and we tried to look into everything we could to figure out what we could do. But at the time,

like I said, I had relocated and put a lot more money into it than if I was just relocating myself."
(Trial Tr. 1-19-10 P.43 L.21-25).

Father also admitted that he did not provide financial support for C.L. while C.L. and
Mother were in Canada, and that he did not send any money to Mother's parents for C.L. He
testified that he never went to Canada to visit C.L., and that he did not have phone contact with
C.L. or Mother during that time. (Trial Tr. 1-19-10 P.27 L.19-P.29 L.1).

Father testified that while Mother and C.L. were living with him in Missouri from May
2006 to May 2007, Mother never talked about returning to Canada and "that was our full
intention, was to stay down here." (Trial Tr. 1-19-10 P.52 L.21-P.53 L.3). He said that while
Mother was in Missouri, they had a joint bank account and she obtained a United States
Government Social Security identification card, although she never acquired a Missouri Driver
License. (Trial Tr. 1-19-10 P.53 L.9-P.54 L.1). He said that when he and Mother crossed the
border separating Canada and the United States in May 2006, she "professed an intention to
remain . . . in the United States." (Trial Tr. 1-19-10 P.55 L.9-24).

Father's parents drove to Loon Lake, Saskatchewan on October 20, 2008, at Mother's
invitation, to take C.L. from Canada to St. Charles, Missouri. (Trial Tr. 1-19-10 P.51 L.1-5).
Father testified that he gave a consent form to his parents so they could cross the border into the
United States with C.L. in October 2008. (Trial Tr. 1-19-10 P.56 L.10-20) (Pl. Ex. No. H).

At the time of the hearing on January 19 and 20, 2010, Father was living in Washington,
Missouri. C.L. had been living with Father's parents in St. Charles since October 2008. Father's
parents had applied for and received guardianship of C.L., after Father waived the right to be
C.L.'s guardian. (Trial Tr. 1-19-10 P.29 L.2-P.30 L.23) (Pl. Ex. 2). The last time Father

communicated with Mother was by e-mail, in what he believes was July of 2009. The last time he spoke to her by telephone was in February 2009, when he called her. (Trial Tr. 1-19-10 P.31 L.9-24).

Father testified that there is no dispute that he is the father of C.L., that he loves his son, and that he did not abandon his parental rights in the guardianship proceedings initiated by his parents. He said that he agreed to waive his right to be C.L.'s guardian for "medical reasons, as far as insurance, and to get him into school." He testified that C.L.'s special education needs are being met in the Francis Howell School District in St. Charles, Missouri. He stated that the reason his son did not live with him when he came back to the United States was because Mother had requested that C.L. stay at his parents' house, and she would not have permitted the child to live with him. (Trial Tr. 1-19-10 P.47 L.8-P.49 L.7).

Since October 2008, Mother has never asked Father to take C.L. back to Canada. (Trial Tr. 1-19-10 P. 51 L.19-23). After C.L. was in the United States, living with his parents, Father testified that since he did not receive any communication from Mother, he believed that he did not have to take any affirmative steps to return C.L. to Mother. (Trial Tr. 1-19-10 P.66 L.20-24).

## B. TESTIMONY OF DWAYNE LOWRY, GRANDFATHER OF C.L.

Defendant Dwayne Lowry ("Grandfather") is 44 years old, and is the grandfather of C.L. He first met Mother on approximately May 20, 2006, when she, Father and C.L. moved into the home Grandfather shared with Grandmother. At that time, C.L. was about one month old. Grandfather testified that Father, Mother and C.L. moved out of his home on May 16, 2007. (Trial Tr. 1-19-10 P.67 L.14-P.68 L.23). Shortly after they moved from his home, Mother and C.L. "returned to Canada." Grandfather became aware that Mother was going back to Canada

two days after she moved out of his house. (Trial Tr. 1-19-10 P.69 L.16-P.70 L.1). Grandfather had no communication with Mother from May 2007 through October 2008. (Trial Tr. 1-19-10 P.82 L.17-22).

In October 2008, a year and five months after Mother and C.L. moved back to Canada, Grandfather and his wife, Cindy Lowry ("Grandmother"), drove to Canada to get C.L. Before that, neither he, his wife, nor his son had visited C.L. in Canada. (Trial Tr. 1-19-10 P.70 L.9-24). Grandfather testified that Mother contacted Grandmother by text message, stating that she "needed us to pick up our grandson." (Trial Tr. 1-19-10 P.71 L.9-16). Grandfather and Grandmother started on their trip to Canada on October 19, 2008, only eight hours after learning that they needed to pick up C.L. (Trial Tr. 1-19-10 P.81 L.5-P.82 L.9). They "dropped everything," got in their car and drove twenty-eight (28) straight hours to Meadow Lake, Saskatchewan, where they met Mother and C.L. at a McDonald's at 11:30 p.m. on October 20, 2008. After talking to Mother for "a few minutes," they took C.L., turned around, and started their trip back to Missouri. They crossed the border, stayed the night of October 21, 2008 in Fargo, North Dakota, and arrived back in St. Charles, Missouri at 7:00 p.m. on October 22, 2008. (Trial Tr. 1-19-10 P.71 L.9-P.72 L.22; P.82 L.1-9). Altogether, they drove about 3600 miles. (Trial Tr. 1-19-10 P.80 L.18-24).

As of the hearing in this case on January 19 and 20, 2010, C.L. has remained with Grandfather and Grandmother since they picked him up in Canada. Grandfather believed that when they took custody of the child, they did so "because she was going to lose her child. We did not want our grandson to be in foster care and that we would be taking care of the child." In response to a question regarding whether he would be taking temporary or permanent custody,

Grandfather, who testified in every respect as a completely honest witness, responded, "[a]t that moment in time, sir, I would - - I honestly had no idea." What is clear is that Grandfather and Grandmother were willing to abandon their activities and drive a total of 56 hours, in order to take C.L. to a safe and comfortable environment. (Trial Tr. 1-19-10 P.73 L.2-P.74 L.6).

When crossing the border between the United States and Canada, Grandfather and Grandmother showed the United States Customs and Border Protection officers the consent form signed by Father. (Pl.'s Ex. H). Grandfather admits that he and his wife told the officers that it was their intent that C.L.'s visit would be temporary, lasting until January 1, 2009. (Trial Tr. 1-19-10 P.76 L.2-17). He testified that he made no decision to keep C.L. permanently; "[t]he decision was made by C.L.'s mother, who has never once, since October 20 of 2008 until January 19, 2010, asked for her child back." He testified that he first learned that Mother wanted C.L. back from a U.S. Marshal on December 31, 2009. He then acknowledged that his son had formerly received a letter from the United States Department of State in September 2009. (Trial Tr. 1-19-10 P.77 L.9-P.79 L.3). Grandfather testified that in retrieving C.L. from Canada, he never intended to infringe on any of Mother's parental rights, nor did he intend to deny her custody or visitation rights, or otherwise deny her access to the child. (Trial Tr. 1-19-10 P.84 L.20-P.85 L.4).

In April 2009, Grandfather and Grandmother filed a Petition in the Probate Court of St. Charles County to become legal guardians of C.L. Grandfather explained that his wife had discussions with Mother about her "not being able to come get her child, not being able to - - not prepared for her child, conversations I am aware of but did not occur between me and [Mother]." (Trial Tr. 1-19-10 P.79 L.15-P.80 L.6). He testified that C.L. needed special services at the

Francis Howell School District, but he was not able to receive those services without the requested guardianship. Additionally, C.L. could not be included as an insured on Grandfather and Grandmother's insurance without the guardianship. (Trial Tr. 1-19-10 P.87 L.8-16). Grandfather testified that in pursuing the guardianship, he had no intention of harming Mother's or Father's rights as parents, or their rights to custody of C.L. (Trial Tr. 1-19-10 P.87 L.19-24). Grandfather also testified that, while C.L. was living with them, Mother did not send a card or gift to C.L. on his birthdays or on the Christmas holidays. (Trial Tr. 1-19-10 P.88 L.20-P.89 L.11).

### C. TESTIMONY OF CINDY LOWRY, GRANDMOTHER OF C.L.

Cindy Lowry ("Grandmother") is the wife of Dwayne Lowry ("Grandfather"), the mother of Joseph Lowry ("Father"), and the paternal grandmother of C.L. She testified that C.L. was born in Canada on April 21, 2006, and when C.L. was one-month old, Mother, Father and C.L. moved from Canada to St. Charles, Missouri, to live with her and Grandfather. They stayed for approximately one year from May 2006 until April 2007. (Trial Tr. 1-19-10 P.96 L.20-P.97 L.14). During this time, Grandmother testified that she provided C.L. with food, clothing, and a place to live, and that Mother never gave Grandmother any money to pay for these things. (Trial Tr. 1-20-10 P.6 L.10-18). At the time, Mother was receiving direct deposits from the Canadian Government. (Trial Tr. 1-20-10 P.5 L. 14-21).

Grandmother testified that, upon moving to St. Charles in 2006, Mother stated that she planned to remain in the United States. Mother told Grandmother that they were planning to apply for Social Security numbers for herself and for C.L., that she intended to become a United States Citizen, and that she intended to go back to school to get her GED. (Trial Tr. 1-20-10 P.6 L.19-P.7 L.11; P.8 L.9-12). However, Mother and C.L. moved back to Canada in May 2007.

(Trial Tr. 1-19-10 P.97 L.14-16).  Grandmother testified that while Mother and C.L. were in Canada between May 2007 and October 2008, Mother never made contact with her.  (Trial Tr. 1-20-10 P.9 L.3-5).  During that time, Grandmother sent Christmas and birthday presents to C.L.  (Trial Tr. 1-19-10 P.98 L.17-22).

Grandmother testified that Mother was the one who initiated contact with her in October 2008 concerning Grandfather and Grandmother taking custody of C.L.  (Trial Tr. 1-20-10 P.8 L.21-24).  The first contact was a text message to Grandmother from Mother.  Grandmother then identified Plaintiff's Exhibit 4 as a document that she prepared, titled "Saved Text Messages To and From Connie Mitsuing."  (Trial Tr. 1-19-10 P.101 L.3-21).  The substance of the text messages included in this document is that Mother was asking Grandmother to go to Canada, pick up C.L., and take him to St. Charles, Missouri.  A message from Mother reports, "[t]hey are trying to call ICFS[1] to take him away from me."  Grandmother believed that the message was intended to convey that Mother's family in Canada was upset with her, and was threatening to call ICFS.  (Trial Tr. 1-19-10 P.103 L.24-P.104 L.20).  Mother had explained that her family was trying to have C.L. taken away from her, and that someone would be taking C.L. the next day.  Mother expressed a sense of urgency.  Grandmother and Mother exchanged text messages with one another as Grandmother and Grandfather were on their way to Canada.  At this time, C.L. was with Mother's sister in Loon Lake and Mother was five hours away, in Edmonton, Saskatchewan.  Grandmother did not know where either Mother or her sister lived.  (Trial Tr. 1-20-10 P.14 L.12 -P.17 L.3).

---

[1]The Court believes that "ICFS" refers to the Indian Child and Family Services Agency that provides services to Mother's community.

Grandmother testified that her intention in going to Canada to pick up C.L. in October 2008 was to keep him from being taken away from Mother and put in foster care. (Trial Tr. 1-20-10 P.5 L.1-6). Grandmother also testified that she understood that C.L. was coming to St. Charles to live with her and Grandfather until Mother could take care of him. (Trial Tr. 1-19-10 P.111 L.2-8). Then, the following interrogation occurred:

> Q. All right. It was understood between you and Ms. Mitsuing that you were going up to Canada to pick up C.L. and he was going to come live with you for a period of time until Ms. Mitsuing asked for his return; true?
>
> A. True.
>
> Q. Now, Ms. Mitsuing asked for the return of her child through the Canadian Government and through the United States Government in September of 2009 in a letter that was addressed to your son, but at your address; true?[2]
>
> A. Correct.
>
> Q. And you didn't return C.L. at that time pursuant to your earlier agreement; true?

---

[2] Grandmother was asked about a letter she received at her home from the State Department. The letter was addressed to Father, but she said that she had become aware of its contents and had employed counsel to respond to it. She said that she agreed with everything that her attorney wrote in the response to the State Department letter. (Trial Tr. 1-20-10 P.41 L.24-P.42 L.25). Grandmother was reminded that the response letter said that she had no physical address for Mother. She was also reminded of representations in the response to the State Department that "[i]n the months that followed Connie Faye Mitsuing failed and refused to provide any contact information as to her current whereabouts, nor did she provide a working telephone number where she could be reached." When it was suggested that this information was not accurate because she had on three separate occasions exchanged phone numbers and reached Mother, Grandmother responded, "[d]ifferent numbers, yes." When again asked if what the State Department was told was not accurate, she stuck by her guns saying "[y]es, it was, at the time." (Trial Tr. 1-20-10 P.60 L.10-P.61 L.10). The Court is not persuaded by Grandmother's testimony when she said that she agreed with her counsel's representations that Mother had refused to provide any contact information as to her current whereabouts. There is no evidence that Mother ever refused to provide contact information; to the contrary, Grandmother initiated many contacts with Mother, and there is no indication that Mother ever declined to accept any of Grandmother's inquiries.

A.  It wasn't an agreement.

Q.  It wasn't an - - well, what was it?  An understanding?

A.  We provided the State Department with all of the information of the whereabouts.  That's what they asked for.

(Trial Tr. 1-19-10 P.112 L.14- P.113 L.7).

Grandmother admitted that while her husband and son had no communication with Mother after October 2008, she had received "text messages for me to call different numbers." (Trial Tr. 1-19-10 P.113 L.16-P.114 L.12).  Grandmother testified that she sent a text message to Mother on December 20, 2008, in which she explained how much they were doing for C.L. and stated that Mother sounded rude.  Mother returned a text message the same day saying, "[t]hat's a good thing, I'm not trying to be mean or anything."  Grandmother also testified that Mother sent her several text messages in January, February, and March of 2009.  These messages included a phone number and a request that Grandmother call Mother at the listed number.  Grandmother testified that she called each time that Mother requested her to call.  There were no text messages exchanged between Grandmother and Mother between March 2009 and July 2009. (Trial Tr. 1-19-10 P.115 L.2-P.116 L.24).

Grandmother testified that she sent Mother an e-mail message on October 26, 2008, which contained a link to the website of Father's girlfriend.  This e-mail was sent a few days after Grandmother and Grandfather picked C.L. up and took him to Missouri.  (Trial Tr. 1-19-10 P.117 L.6-18) (Pl.'s Ex. 5, doc. #26-5, p.1).  It appears that Father's girlfriend, who did not live with Grandfather and Grandmother, sold nude photographs on the Internet.  As a result, Mother did not want C.L. to go to Father's home, rather, she wanted him to stay with Grandfather and

Grandmother, in their home. (Trial Tr. 1-19-10 P.17 L.10-P.119. L.20). In an e-mail to Mother dated October 28, 2008, Grandmother states, "[Grandfather] and I are both on your side and you don't have to worry about us. We will do whatever you want us to do for [C.L.]." (Trial Tr. 1-19-10 P.120 L.18-23) (Pl.'s Ex. 5, doc. #26-5, p.2). She sent Mother a similar message on November 1, 2008, stating, "[w]e are enjoying our time with [C.L.], hope this time helps you with what you have to do. Don't worry about [C.L.], we'll take good care of him." (Pl.'s Ex. 5, doc. #26-5, p.4) (Trial Tr. 1-19-10 P.121 L.17-25).

Page 7 of Plaintiff's Exhibit No. 5 contains an e-mail message sent from Grandmother to Mother, dated November 15, 2008. In the e-mail, Grandmother asks Mother if C.L. is going to be "here" in April, because they were thinking about taking C.L. to visit Grandmother's parents in Yuma, Arizona, which is close to Disneyland and SeaWorld in California. Grandmother says, "[m]y mom and dad would love to see [C.L.] and I think he would have alot [sic] of fun at Disney. He really likes the MickyMouse [sic] Club cartoon in the mornings. Let me know what you think." (Pl.'s Ex. 5, doc. #26-5, p.7). Grandmother testified that she did not hear from Mother concerning her request. This was about a month after Grandfather and Grandmother had taken custody of C.L. (Trial Tr. 1-20-10 P.21 L.4-16). Grandmother continued to communicate with Mother by e-mail, sending another e-mail on November 17, 2008, stating, "[p]lease let me know about us taking him to Disneyland for his birthday in April so I can buy the airline tickets." (Pl.'s Ex. 5, doc. #26-5, p.9).

Grandmother e-mailed Mother on January 15, 2009, because she wanted C.L. to get a passport so that he could cross the border. (Trial Tr. 1-19-10 P.125 L.10-15). Grandmother admitted that she was putting pieces in place so that when Mother was ready, C.L. would have a

passport to go back to Canada to be with his mother. (Trial Tr. 1-19-10 P.125 L.22-P. 126 L.1). Grandmother also regularly e-mailed photographs of C.L. to Mother in February and March of 2009. (Trial Tr. 1-19-10 P.126 L.2-P.127 L.25). It is clear that from October 2008 through March 2009, Grandmother was communicating with Mother "[e]very week or so. Maybe every couple of weeks after that." Then, the communication stopped until July 2009. (Trial Tr. 1-19-10 P.128 L.1-10).

In April 2009, shortly after Grandmother stopped exchanging regular e-mails with Mother, she and Grandfather initiated guardianship proceedings to become legal guardians of C.L. Grandmother testified that she had discussed with Mother that she and Grandfather were going to seek legal guardianship of C.L. (Trial Tr. 1-19-10 P.129 L.16-P.130 L.6). However, she admitted that she did not send a text message or e-mail to Mother, to notify her when the guardianship proceedings were taking place. (Trial Tr. 1-20-10 P.62 L.12-18). In their application for guardianship, in a sworn affidavit, Grandmother and Grandfather stated that they "have engaged in a due and diligent search, and have no information leading to the whereabouts of CONNIE FAYE MITSUING, natural mother of the minor child." (Pl.'s Ex. 3, doc. #26-3, p.16). When asked if that was truthful, Grandmother testified, under oath, "[y]es[,] I have twelve phone numbers and two provinces and five cities to contact her." (Trial Tr. 1-19-10 P.130 L.7-P.131 L.4). Grandmother testified that her affirmation to the Probate Court that she had no address for Mother was not inaccurate. However, when she was asked if she was ever able to connect a particular phone number with a particular address, she responded, "[j]ust her dad's house." Grandmother does not deny that she did not disclose this information to the Probate Court, nor does she deny that she did not disclose any of the eighteen phone numbers she claimed

13

to have had for Mother. (Trial Tr. 1-20-10 P.34 L.8-16). The Court finds this testimony to be misleading, especially considering that Grandmother had received a text message from Mother a mere 13 days before Grandmother signed the application for guardianship. (Trial Tr. 1-19-10 P.131 L.8-13).

Grandmother testified that she and Grandfather were awarded no custody rights of C.L. in the guardianship proceeding, but that, as a result of those proceedings, they were allowed to get the following for C.L.: medical coverage, a social security number, and special help from the Francis Howell School District. She testified that C.L. was diagnosed as being developmentally delayed by one year, and was in need of special services, which are now being provided by the Francis Howell School District. (Trial Tr. 1-20-10 P.31 L.17-P.32 L.15). C.L. currently attends full-day preschool at Francis Howell, and has another year of preschool before he will be eligible for admission to kindergarten in the Fall of 2011. (Trial Tr. 1-20-10 P.43 L.20-P.44 L.5).

Grandmother testified that there was no understanding between her and Mother as to when C.L. would be returned to Canada; rather, "[i]t was open ended." Mother did not provide a date or a period of time at which she expected the visit to end. (Trial Tr. 1-20-10 P.11 L.17-25). Grandmother also testified that Mother never contacted her by phone, by text message, by e-mail, or by regular mail about bringing C.L. back to Canada, nor did she say that she would be coming to the United States to pick up her son and take him back to Canada. (Trial Tr. 1-20-10 P.6 L.3-9). With respect to the January 1, 2009 deadline in the paper signed to accomplish C.L.'s passage from Canada to the United States, it appears that the date was inserted in order to satisfy customs officials and it had no significance as to when anyone associated with this litigation believed C.L. would go back to Canada. Grandmother continued to communicate with Mother after the

January 1st date, through the middle of March 2009.  Mother's communications with Grandmother during this time did not indicate when or if she wanted C.L. to be returned to Canada.  (Trial Tr. 1-20-10 P.23 L.3-P.25 L.6).  After March 2009, Grandmother did not hear from Mother until July 1, 2009, when Grandmother received an e-mail message from Mother, six months after the January 1, 2009 date.  The e-mail did not include a request that Grandmother return C.L. to Canada, nor did Mother say that she would be coming to the United States to get C.L.  Mother did say that she wanted to come visit C.L., stating, "[I]'ll fly there for like a week, [I] would like it to be soon b/c [I]'ll be starting school soon. [S]o just e-mail back as soon as you can."  (Trial Tr. 1-20-10 P.26 L.18-P.28 L.12) (Pl.'s Ex. 5, doc. #26-5, p.18).

Grandmother testified that while she has had custody of C.L., she has had eighteen telephone numbers for Mother.  (Trial Tr. 1-20-10 P.30 L.8-11).  Also, during that fifteen-month period, she has not received any mail from Mother with a return address.  (Trial Tr. 1-20-10 P.15-18).  According to Grandmother, while C.L. has been in her custody, a birthday and two Christmases have been celebrated, and C.L. has never received a card or a present from Mother, although Mother did call.  Grandmother testified that she has never received any money or other support for C.L. from Mother.  (Trial Tr. 1-20-10 P.34 L.24-P.36 L.1).  She stated that she has never concealed C.L.'s location from Mother, has never refused access to C.L., and only conditioned Mother's calling C.L. on Mother paying for the calls.  (Trial Tr. 1-20-10 P.36 L.12).

Grandmother testified that she initially took custody of C.L. for a temporary visit, but she has since changed her mind.  She admitted that she did not send an e-mail or text message to Mother, saying that she wanted to keep C.L., permanently.  (Trial Tr. 1-20-10 P.63 L.5-14).  Grandmother explained that, over a period of time, her view about C.L. remaining in the United

States has changed. She testified, "the more things [Mother] told me and my son, that's when my opinion changed." Grandmother stated that Mother told her in January that she needed to stay in Canada for a hearing on charges of stealing a car, and in February she had to stay in Canada for a court hearing concerning alleged abuse against a boyfriend. Grandmother also stated that she received information in February from Mother's family that she was moving from place to place and "we couldn't find her." Grandmother testified that C.L. was getting adjusted to living with them, he was in school making good progress with his special education, and "he's really attached to me."[3] (Trial Tr. 1-20-10 P.47 L.8-P.48 L.16).

Grandmother testified that she saw the letter from the State Department addressed to her son, which was sent on September 10, 2009, and knew that the letter stated that Mother was asking, through the State Department, for C.L. to be returned to her. (Trial Tr. 1-19-10 P.133 L.16-P.134 L.25). Grandmother testified that her position is that if Mother showed up at her house next week to pick C.L. up, she would provide him to her. (Trial Tr. 1-19-10 P.140 L.18-21).

## II. APPLICABLE LAW

In 1980, a group of countries participated in and adopted the Hague Convention on the Civil Aspects of International Child Abduction ("the Hague Convention"). Although the United States did not participate in the actual proceedings, it ratified the Hague Convention in 1988, by enacting the International Child Abduction Remedies Act ("ICARA"). *See* 42 U.S.C. § 11601-

---

[3] There can be no doubt from a careful review of the record and from observing the witnesses, that Grandfather and Grandmother have, in all respects, provided excellent custodial care for C.L., that his interests have been raised above their own, and that they unquestionably love C.L., and would deny him nothing in his best interests.

11611 (1988).  The stated purpose of the Hague Convention was "to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."  Hague Convention on the Civil Aspects of International Child Abduction art. 1, Oct. 25, 1990, 19 I.L.M. 1501.  In carrying out this stated purpose, the Hague Convention provides for the return of a child who has been "wrongfully removed or retained" from the country in which he or she is a habitual resident.  *Id.* arts. 3, 12.  The removal or retention of a child is considered to be "wrongful" when it is in breach of the custody rights of another person, and when those custodial rights were actually being exercised at the time, or would have been exercised but for the removal or retention.  Custodial rights, and any breach thereof, are determined under the law of the country that is determined to be the child's habitual residence.[4]  *Id.* art. 3.

As noted by the Eighth Circuit, "[t]he key inquiry under the Convention is whether a child has been wrongfully removed from the country of its habitual residence or wrongfully retained in a country other than that of its habitual residence."  *Barzilay v. Barzilay*, 536 F.3d 844, 847 (8th Cir. 2008).  In determining whether a child was wrongfully removed or retained under the Hague

_____

[4]The Hague Convention distinguishes between "rights of custody" and "rights of access." The former refers to the "rights relating to the care of the person of the child," and specifically requires the person asserting custody to possess "the right to determine the child's place of residence."  The latter, however, refers to "the right to take the child for a limited period of time to a place other than the child's habitual residence."  *Id.* art. 5.  Rights of custody are assigned greater protection under the Hague Convention than are rights of access; the Hague Convention provides for the return of the child to his or her habitual residence in cases involving rights of custody, but in cases involving rights of access, the Hague Convention only requires a country to take "steps to remove, as far as possible, all obstacles to the exercise of such rights."  *Id.* arts. 12, 21; *see Gonzalez v. Gutierrez*, 311 F.3d 942, 948-49 (9th Cir. 2002).

Convention, a court is to address a series of four questions, initially set forth by the Ninth Circuit and subsequently adopted by many other courts, including the Eighth Circuit. These questions are:

> (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001); *see also Barzilay*, 536 F.3d at 847. The Court will address these issues in the sections that follow.

It is important to note that "[a] case arising from a petition under the Hague Convention is not a custody proceeding. A United States district court 'has authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim.'" *Barzilay*, 536 F.3d at 847 (quoting *Shalit v. Coppe*, 182 F.3d 1124, 1128 (9th Cir. 1999)).

## III.    CONCLUSIONS OF LAW

As the Court was considering the first of the four inquiries, regarding when the retention[5] at issue in this case took place, it became clear that the real issue in this case is whether C.L. has been retained in the United States. *See Toren v. Toren*, 191 F.3d 23, 27 n.3 (1st Cir. 1999) ("The structure of [Article 3] clearly establishes the proper order of inquiry: first, the court should inquire into whether there has been any removal or retention at all; and second, the court should

---

[5]The Court notes that Mother is asserting wrongful retention in violation of the Hague Convention, and not wrongful removal. This is presumably because when C.L. was removed from Canada to the United States by Grandfather and Grandmother, they had the express permission of both Mother and Father.

inquire into whether such removal or retention has been wrongful."). Thus, the Court must first determine if there has been any retention, whether wrongful or not, in this case.

"Neither the Hague Convention nor ICARA actually defines the term 'retention.'" *Pielage v. McConnell*, 516 F.3d 1282, 1287 (11th Cir. 2008). However, at least one case has suggested that "a child is not retained under the Convention until a parent unequivocally communicates his or her desire to regain custody." *Karkkainen v. Kovalchuk*, 445 F.3d 280, 290-91 (3d Cir. 2006) (holding that it was clearly erroneous for the District Court to find that Plaintiff had not clearly communicated her opposition to the child's presence in the United States until she filed the petition for return). Additionally, the Court of Appeals for the Eleventh Circuit offered this well-reasoned analysis:

> According to one dictionary, the primary definition of the term "retain" is "to keep possession of." *Random House Unabridged Dictionary* 1643 (2d ed. 1993). This meaning of the term "retention" is supported by the Pérez-Vera Report, which states that the Hague convention was meant to remedy situations where a "child is taken out of the family and social environment in which [he] has developed." Elisa Pérez-Vera, *Explanatory Report on the 1980 Hague Child Abduction Convention*, *in* 3 *Acts and Documents of the Fourteenth Session*, *Child Abduction* ¶ 12 (1982). This indicates that the term "retention" is meant to cover the circumstances where a child has been prevented from returning to his usual family and social environment. *See also id.* ¶ 110 ("In fact, we must not forget that it is the right of children not to be removed from a particular environment which sometimes is a basically family one, which the fight against international child abductions seeks to protect.").

*Pielage*, 516 F.3d at 1288 (internal footnote omitted). Thus, in deciding whether there has been a retention under the Hague Convention, this Court will consider: 1) whether Mother unequivocally communicated her desire to regain custody of C.L.; and 2) whether any of the Defendants have prevented C.L. from returning to his usual family and social environment.

In this case, it is clear that Mother attempted to unequivocally communicate her desire to regain custody of C.L. through the September 10, 2009 letter from the United States Department of State, and her initiation of proceedings under the Hague Convention. Immediately upon learning of the contents of the letter, Grandmother and Grandfather employed counsel in what was an obvious attempt to retain custody of C.L. In the response letter to the State Department, Defendants' counsel supplied inaccurate information, continuing a pattern of misrepresentation that began when Grandmother misrepresented known information about the lack of communication with Mother during the guardianship proceedings. Grandmother testified that her opinion regarding who should have custody of C.L. changed from the time that she and Grandfather first acquired custody of the child in October 2008. She stated that C.L. has become very attached to her. However, she now states that she is prepared to return C.L. to Mother, upon Mother's appearance in Missouri to obtain custody.

Considering that there can be no retention unless a person is keeping possession of a child, and preventing that child from returning to his or her usual family and social environment, the issue of the current retention of C.L. by Grandmother and Grandfather is confusing. Based on the evidence presented, it appears that none of the Defendants have prevented C.L. from returning to Canada. Grandmother and Grandfather, in initiating proceedings for guardianship of C.L., supplied known misleading information to the probate court, and, through counsel, provided misleading information to the State Department. However, there is no evidence that Mother was ever told that she could not have C.L. back, or that he would be prevented from returning to Canada in any way. Significantly, Grandmother testified before this Court that if Mother were to show up at Grandmother and Grandfather's house to pick C.L. up, they would allow the child to

leave with her. Mother has not offered any evidence to rebut this assertion. The Court also notes that it was Grandmother, not Mother, who initiated the process of obtaining a passport for C.L. so that he could cross the border back into Canada when Mother was ready.

While Mother has never been prevented from getting the child, it is the Court's view that Grandmother and Grandfather took affirmative steps to enhance their position in retaining custody of C.L., specifically initiating guardianship proceedings. Additionally, when the notification came from the State Department, rather than respond that they would voluntarily relinquish custody of C.L. to Mother, they took action to resist turning over custody. Their responsive letter states, in part, "In the months that followed, Connie Faye Mitsuing failed and refused to provide any contact information as to her current whereabouts . . . ." (Pl.'s Ex. 8, doc. #26-7). After C.L. was brought from Canada to live with Grandmother and Grandfather, Grandmother communicated with Mother regularly, including just a few days before this letter was written to the State Department.

Mother argues that C.L. was retained after January 1, 2009, the date that was listed on the consent form that was used by Grandfather and Grandmother to cross the border and enter the United States with C.L. in October 2008. However, as the Court found above, the January 1, 2009 date was completely arbitrary, and was merely included in the documents to satisfy the customs officials.[6] The evidence does not suggest that anyone involved in this litigation actually believed that January 1, 2009 was the absolute final date on which C.L. would return to Canada. Moreover, Mother's communications with Grandmother after January 1, 2009, specifically her

---

[6]The Court notes that it does not condone this type of conduct, no matter how noble the cause.

21

failure to even mention the topic of C.L.'s return, confirms this notion. Thus, the Court rejects Mother's argument that C.L. was retained in the United States after January 1, 2009, at least until the notification from the State Department.

The letter from the State Department was the first time that Grandmother and Grandfather were notified that Mother was requesting that custody of C.L. be returned to her. That letter states, "[i]f a voluntary return is not agreed to, legal proceedings under the Hague Convention may be initiated by Connie Faye Mitsuing." (Pl.'s Ex. 8, doc. #26-7). The Court has no doubt that the State Department letter was a demand for the return of C.L. The letter encouraged the voluntary return of C.L. to the country of Canada, for a custody determination there.

The Court is persuaded that Grandmother and Grandfather initially took custody at the request of Mother for the protection of C.L. Between October 2008 and September 2009, Grandfather and, particularly, Grandmother became bonded with C.L. They initially resisted Mother's efforts under the Hague Convention to regain custody, and it is clear that, if given free will, Grandmother and Grandfather would maintain custody of C.L. However, at the time of the hearing, Grandmother testified that if Mother came to her home to pick up C.L., Grandmother would relinquish custody. Therefore, Mother has failed to set forth facts that support her claim that C.L. is being wrongfully retained in the United States in violation of the Hague Convention. "Absent a threshold showing that there has been a retention or removal, the district court lack[s] jurisdiction to grant or deny the [Hague Convention] petition." *Toren v. Toren*, 191 F.3d 23, 29-30 (1st Cir. 1999). Thus, this Court cannot consider the merits of Mother's Complaint, and could dismiss the case.

However, the Court notes that it is relying heavily on Grandmother's representation at the evidentiary hearing that C.L. would be returned to Mother if she showed up at Grandmother and Grandfather's house to pick him up. If the Court dismisses this case outright and Grandmother's testimony turns out to be false,[7] the result is a significant hardship to Mother. This is of particular concern because of Grandmother's history of supplying misleading information to the probate court and the State Department. If Mother tries to take custody of C.L. in Missouri and is prevented from taking the child with her, she would be forced to reinitiate the entire Hague Convention process. Mother's remote location, lack of access to attorneys, and lack of resources makes this an appreciable burden that the Court cannot ignore.

As a result, the Court will wait thirty days before issuing a final judgment, dismissing Mother's Hague Convention Complaint. Respective counsel shall confer, and determine whether they can reach an agreement as to when Mother will come to St. Louis to take custody of C.L. from Defendants. If the Parties are unable to reach an agreement due to Defendants' unwillingness to cooperate, the Court will conclude that the child is being retained in Missouri, and shall set the case for a final hearing. If an agreement is reached and Mother comes to the United States during the aforementioned thirty day period to get C.L., at the agreed time, Grandmother and Grandfather shall deliver C.L. to Courtroom 12 South at the United States Courthouse, 111 S. 10th St., St. Louis, Missouri 63102. Mother shall take custody of C.L. and the case will be dismissed. If an agreement is reached and Mother fails or refuses to come to the United States at the agreed time to get C.L., the case will be dismissed.

---

[7]Although the Court genuinely hopes that Grandmother's testimony was completely truthful, it must be noted that she has demonstrated a tendency to give misleading information in an effort to accomplish what she believes is best for C.L.

If further proceedings are required in this case, the Court will likely need to engage in a full analysis of whether C.L. was wrongfully retained in the United States by any of the Defendants, in violation of the Hague Convention.[8] The Court is persuaded that C.L.'s habitual residence is Canada. The Eighth Circuit has noted that:

> [t]he determination of a child's habitual residence presents mixed questions of law and fact and requires the analysis of many factors, including the settled purpose of the move to the new country from the child's perspective, parental intent regarding the move, the change in geography, the passage of time, and the acclimatization of the child to the new country.

*Barzilay v. Barzilay*, 536 F.3d 844, 851-52 (8th Cir. 2008) (citing *Silverman v. Silverman*, 338 F.3d 886, 897-98 (8th Cir. 2003); *Mozes v. Mozes*, 239 F.3d 1067, 1071-81 (9th Cir. 2001)).[9]

---

[8]As set forth above, this analysis requires the Court to consider the following issues: "(1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?" *Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001).

[9]Although it appears likely that Canada is C.L.'s habitual residence, this does not necessarily mean that Mother will prevail on her Hague Convention Complaint. The Hague Convention establishes several affirmative defenses that may be advanced in opposition to a Hague petition. First, a court may not be required to return a child to his or her habitual residence if the Convention proceedings are not brought within one year of the date of the wrongful removal and the child has settled into his or her new environment (hereinafter, "the well-settled defense"). Hague Convention on the Civil Aspects of International Child Abduction art. 12, Oct. 25, 1990, 19 I.L.M. 1501. Additionally, a court is not required to return a child if the person now asserting custodial rights "had consented to or subsequently acquiesced in the removal or retention." *Id.* art. 13. Another exception exists when "there is a grave risk that [a child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Id.* The return of a child may also be avoided if the child objects to the return and is of sufficient age and maturity to make such a decision. *Id.* Finally, a court may refuse to return a child when it would be contrary to the country's "fundamental principles" with respect to freedom and human rights. *Id.* art. 20. The Eighth Circuit has established that "a court applying the Hague Convention should construe these exceptions narrowly." *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir. 1995). In this case, Defendants have asserted various affirmative defenses.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff Connie Faye Mitsuing's Complaint for Return of Child to Petitioner and for Immediate Issuance of Show Cause Order to Respondents [doc. #1] is **HELD IN ABEYANCE** for thirty days from the date of this Order.  The Court will reexamine the matter after May 21, 2010.

Dated this <u>21st</u> Day of <u>April</u>, 2010.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE